[No. A052393. First Dist., Div. Three. Apr. 24, 1992.]

MATTHEW A. OLIVER, Plaintiff and Respondent, v.
JAMES F. BLEDSOE et al., Defendants;
BURLINGAME BANK & TRUST CO., Third Party Claimant and
Appellant.

**COUNSEL**

Carr, McClellan, Ingersoll, Thompson & Horn and David M. McKim for Third Party Claimant and Appellant.

Buchalter, Nemer, Fields & Younger, Stephen H. Pettigrew, Breck E. Milde and Daniel G. Herns for Plaintiff and Respondent.

No appearance for Defendants.

**OPINION**

**WERDEGAR, J.**—Burlingame Bank & Trust Co. (Bank) appeals from an adverse judgment after hearing on its third party claim to a promissory note and deed of trust. (Code Civ. Proc., § 720.110 et seq.) In determining the appeal, we consider the interaction between section 9505, subdivision (2) of the California Uniform Commercial Code, which permits a secured creditor to foreclose on an item of collateral without sale, and the provisions of the Enforcement of Judgments Law (Code Civ. Proc., § 680.010 et seq.) that govern the survival, extinction, expiration, and enforcement of execution liens. We will hold that (1) a secured creditor with notice of the lien may not extinguish an execution lien by utilizing the foreclosure procedure set forth at California Uniform Commercial Code section 9505, subdivision (2), where this result is prejudicial to the lienholder and the lienholder has not received notice of the proposed foreclosure; and (2) such a purported foreclosure does not prevent the attachment of a subsequent overlapping execution lien.

**BACKGROUND**

At issue in this case is a $500,000 promissory note executed by Kristoffer Ning Chang in favor of James Bledsoe and secured by a deed of trust on real property in Hillsborough (the note or the Chang note).[1] Appellant Bank claims unencumbered ownership of the note as a consequence of its notice to its debtor Bledsoe and "retention" of the note pursuant to California Uniform Commercial Code section 9505, subdivision (2) (hereinafter section 9505(2), quoted at fn. 3, *post*). Respondent Matthew Oliver claims an interest in the note sufficient to satisfy his execution lien arising out of a lawsuit against Bledsoe. These competing claims arose out of the following facts.

In February 1988, Bledsoe pledged the note to Bank as collateral for a $250,000 line of credit, at which time Bank took possession of the note. In early July 1988, Oliver obtained a judgment against Bledsoe in the amount of $102,000, pursuant to which a writ of execution issued. On July 21, 1988, at Oliver's direction, the sheriff served on Bank a notice of levy under writ of execution. In a memorandum of garnishee served on the sheriff, Bank

---

[1]The record includes a copy of the deed of trust, but not the note.

described the note as an "obligation owed to the judgment debtor that is not levied upon."[2]

At the time of the levy Bledsoe apparently owed Bank not only the $250,000 secured by the Chang note, but also certain unsecured debts. After receiving Oliver's notice of levy, Bank created a second security interest in the Chang note by obtaining Bledsoe's signature on a second promissory note and pledge agreement for $75,000. The new security interest arose after Oliver's execution lien, and Bank does not contest the trial court's finding that this interest was subordinate to the lien.

On December 27, 1988, counsel for Bank wrote to Bledsoe declaring that both the $250,000 and the $75,000 loans were in default. The letter also stated Bank's "proposal and intention to retain the [Chang] Note and Deed of Trust in satisfaction of all obligations owed by you under the two referenced loans, pursuant to the provisions of California Commercial Code section 9505(2)." This was in effect a proposal by Bank to keep the Chang note in exchange for a discharge of the debts that it secured. Bledsoe apparently received the letter and failed to object to the proposal within the statutorily prescribed 21 days. On this basis, Bank took the position that as of January 17, 1989 (21 days after notice to Bledsoe), it had acquired Bledsoe's interest in the note. Sometime later, in April 1989, Bledsoe filed a lawsuit contesting Bank's claim.

Bank did not send Oliver a copy of its December 27, 1988, Bledsoe letter or otherwise notify him that it had invoked section 9505(2). So far as the record shows, Oliver first learned of these matters on or about July 14, 1989, when counsel for Bank wrote to Oliver's counsel enclosing copies of pleadings from Bledsoe's suit. Bank's cover letter did not discuss the suit except to suggest that attempts were underway to resolve the dispute by agreement. The letter, however, repeated Bank's argument in its earlier memorandum of garnishee that Oliver's 1988 notice of levy failed to reach the Chang note. Counsel for Oliver wrote back disputing this assertion, reasserting Oliver's claim of an execution lien, and objecting to any disposition of the Chang note that did not properly recognize Oliver's lien. On July 26, 1989, Oliver's attorney caused the sheriff to serve a second notice of levy on Bank. Bank apparently responded with a second memorandum of garnishee asserting that the levy did not reach the Chang note. (See fn. 2.)

---

[2]The record contains two such memoranda, both undated. Both conceded that the Chang note was an "obligation" due Bledsoe and was in Bank's possession. The assertion the note was not reached by the levy apparently rested on the notion the notice of levy was insufficiently specific. No such contention is pursued on appeal.

Approximately one year later, from July through October 1990, Bank filed three successive third party claims in this action. Viewed collectively they assert the following theories: (1) Bank held a security interest in the Chang note in connection with the original $250,000 line of credit; (2) Bank became "sole" owner of the note by invoking section 9505(2); (3) any execution lien arising from Oliver's first notice of levy had expired on July 16, 1990; (4) the first notice of levy did not adequately identify the Chang note as an asset levied upon; (5) at the time of the second levy in July 1989, Bank "no longer held any leviable assets and the [second] levy was entirely ineffective"; and (6) Bank had a banker's lien in the Chang note based on Bledsoe's overdrafts in the amount of $73,996.70. No claim was made as to Bledsoe's $75,000 note, which according to Bank had been "paid off" using income from the Chang note.

The trial court denied Bank's claim of ownership and denied in part and granted in part its claim of third party security interest. The trial court concluded that (1) Bank held a senior security interest in the Chang note based on Bledsoe's original $250,000 note and pledge; (2) Oliver's first levy on the note was effective to create an execution lien in his favor; (3) Bank did not achieve ownership of the note and had not extinguished Oliver's lien under section 9505(2), because Oliver had no notice of Bank's election to proceed under that statute; (4) Oliver's second levy was effective and served to continue his original lien for purposes of seniority; (5) Bank's security interest based on Bledsoe's second, $75,000 note and pledge agreement was junior to Oliver's execution lien; and (6) Bank failed to establish its claim of a banker's lien. The court ordered Bank to account for all proceeds from the Chang note.

DISCUSSION

### I. *Section 9505(2) and Execution Liens*

Despite rather disjointed arguments on both sides, we are satisfied the central issue may be simply stated: Did Oliver's execution lien survive Bank's purported retention of the Chang note under section 9505(2)?[3] That statute brings into the modern law of secured transactions a version of the traditional remedy of "strict foreclosure" by which a default-ing mortgagor could be barred ("foreclosed") from asserting title to the

---

[3]Section 9505(2) provides in relevant part: "[A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor . . . . In the case of consumer goods no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received (before sending his notice to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within 21 days after

property or a right of redemption. (2 Gilmore, Security Interests in Personal Property (1965) §§ 43.2, 44.3, pp. 1184-1185, 1220.) This remedy of "strict foreclosure" is to be distinguished from the more familiar modern remedy of "foreclosure by sale," in which a mortgagee sells the mortgaged property, retains a right to a judgment for any deficiency, and incurs an obligation to distribute any surplus proceeds to the debtor or other creditors. (See *id.*, § 43.2, p. 1188.)

The critical issue here is the effect of strict foreclosure under section 9505(2) on the rights of third parties—specifically, execution lienholders. ■■■■ As Bank would have it, a successful foreclosure cuts off not only the debtor's interest, but the interests of such lienholders, even though the secured creditor, with written notice of the lienholders' claims, did not apprise them of the proposed foreclosure or give them any opportunity to oppose it. We reject this view as not only unsupported by the language of section 9505(2), but subversive of its purpose and of the legislative scheme reflected in both the California Uniform Commercial Code and the Enforcement of Judgments Law (Code Civ. Proc., § 680.010 et seq.).

By its terms, section 9505(2) has no direct application to liens. ■■■■■■ The section provides in pertinent part that a secured creditor in possession may propose to "retain" collateral, in exchange for a discharge of the underlying debt, upon notice to and acquiescence by the debtor and certain "secured parties."[4] Any party entitled to notice can prevent the proposed foreclosure merely by serving a written objection within the statutory time period. If such an objection is served, the foreclosing creditor must resort to the more common remedy of liquidating the collateral by sale or other disposition. (§ 9505(2); see Cal. U. Com. Code, § 9504.) In the absence of objection, the creditor may "retain the collateral in satisfaction of the debtor's obligation." (§ 9505(2).)

---

the notice was sent, the secured party must dispose of the collateral under Section 9504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation."

[4] A "secured party" is defined as "a lender, seller or other person in whose favor there is a security interest, including a person to whom accounts or chattel paper have been sold. . . ." (Cal. U. Com. Code, § 9105, subd. (1)(m).) A "security interest" is "an interest in personal property or fixtures which secures payment or performance of an obligation." (*Id.*, § 1201, subd. 37(a).) The "security interests" addressed in division 9 of the code are those arising by consent; thus, a "security interest" is created or provided for by a "security agreement." (*Id.*, § 9105, subd. (1)(*l*); see 3 West's U. Laws Ann. (1981) U. Com. Code, 1972 Off. com. to § 9-102, p. 78 [article intended to reach all "consensual security interests"].)

A secured party is to be distinguished from a "lien creditor," defined as "a creditor who has acquired a lien on the property involved by attachment, levy or the like . . . ." (Cal. U. Com. Code, § 9301, subd. (3).) Although an execution lien may be said to "secure[] payment . . . of an obligation" (*id.*, § 1201, subd. 37(a)), the obligation is not consensual, but imposed by law.

■    ■ Bank argues that the California Uniform Commercial Code distinguishes between "secured parties" and "lien creditors" (see fn. 4, *ante*) and that section 9505(2) does not by its terms require notice to lien creditors. We agree. We reject, however, Bank's further argument that this legislative silence manifests an intent to excuse a foreclosing creditor from giving such notice.[5] Rather, with respect to liens, section 9505(2) cannot be assumed impliedly to prescribe any particular rule. Not only does the section fail to mention liens, but division 9, the relevant portion of the California Uniform Commercial Code, explicitly exempts liens from its coverage. (Cal. U. Com. Code, § 9104, subd. (h) [div. 9 inapplicable "[t]o a right represented by a judgment (other than a judgment taken in a right to payment which was collateral)"]; 2 White & Summers, Uniform Commercial Code (3d ed. 1988) Scope of Article Nine, § 23-2, pp. 242-243 & fn. 3 [execution liens are exempt from art. 9]; Cal. U. Com. Code, § 9102, subd. (2) [div. 9 generally inapplicable to statutory liens]; *id.*, § 9104, subd. (c) [same].)

Under the foregoing authorities, the presumption is that division 9 of the code has no direct bearing on liens except where they are expressly mentioned. (E.g., Cal. U. Com. Code, §§ 9301, 9310, 9504, subds. (1)(c), (2) & (4).) Where liens are not mentioned, as in section 9505(2), they must be viewed as deliberately omitted. The evident legislative expectation was that such issues as were not covered by the code would be resolved by judicial rulemaking based on applicable statutes, precedents, and principles and on the overarching policies and purposes of the code itself. (See Cal. U. Com. Code, § 1102, subd. (1) [code shall be liberally construed and applied to promote underlying purposes and policies]; *id.*, § 1103 [unless displaced by particular provisions of code, "the principles of law and equity . . . shall supplement its provisions"]; 1 West's U. Laws Ann. (1989) U. Com. Code, Off. com. 1 to § 1-102, p. 13 ["the proper construction of the Act requires that its interpretation and application be limited to its reason"]; Note, *How Appellate Opinions Should Justify Decisions Made Under The U.C.C.* (1977) 29 Stan.L.Rev. 1245, 1258 ["The statute was drafted as a legislative mandate for the courts to 'find' the law in the commercial context rather than a legislative determination of what should be the law."].)

---

[5]Bank asserts that if the Legislature had wanted to require notice to lienholders under section 9505(2), it could have used the term "creditor" in lieu of "secured party." Of course, that term would have created numerous difficulties of its own. Moreover, this kind of logic can be turned around: If the Legislature had wanted to *excuse* foreclosing creditors from giving notice to lienholders, it might easily have said so. Indeed, something along these lines is suggested by the portion of section 9505(2) stating that where the collateral is consumer goods, notice must be given to the debtor but "no other notice need be given." The absence of a similar clause with respect to notice in other cases invites an interpretation that the drafters contemplated, and deliberately left the statute open to, the possibility that notice to persons other than secured creditors might, or would, be necessary.

A rule requiring a foreclosing creditor to give notice to lienholders is an appropriate instance of such interstitial rulemaking. Professor Gilmore, one of the major participants in the drafting of the code, wrote that "lienors" should possess the same right to object to a strict foreclosure under section 9505(2) as is afforded to "secured parties." (2 Gilmore, Security Interests in Personal Property, *supra*, § 44.3, pp. 1225-1226.)[6] Although Professor Gilmore did not address the precise question that concerns us here—the lienholder's entitlement *to notice* of a proposed strict foreclosure—the basic principle is clear: To the end that their rights in the collateral as third parties can be respected equally with those of secured parties without prejudice to the secured creditor in possession, lien creditors should be granted equiva- lent procedural rights so far as is practical. (See 9 Hawkland et al., UCC Series (1991) § 9-505:06 (Art. 9), pp. 862-863.) We need not say what this might mean in a case where the creditor in possession has no written notice of the lien. Certainly the principle extends far enough to impose a duty of notice where the creditor *does* receive written notification. And that is the case whenever, as here, the creditor receives a notice of levy sufficient to create an execution lien in the collateral. Such a creditor is thereafter on written notice of the lien and cannot hope to extinguish it by strict foreclosure, without giving the lienholder notice and an opportunity to object.

To hold otherwise would encourage mischief. A secured creditor who received notice of levy would be tempted promptly to serve a section 9505(2) notice of strict foreclosure on the debtor, hoping that the statutory period would elapse without the lienholder learning of the impending extinction. Assuming there were surplus value in the collateral (for otherwise survival of the lien would be academic), the creditor in possession, the debtor, and any junior secured parties would all have a financial incentive to deprive the lienholder of the surplus value to which he or she would be entitled in liquidation. (See Cal. U. Com. Code, § 9504.) For instance, in the clearest example, these parties could agree among themselves to divide up the surplus to the exclusion of the lienholder. Even without collusion, a rule that encouraged the deliberate disregard of a lienholder's perfected rights would operate in derogation of the central guiding principles of commercial reasonableness (see Cal. U. Com. Code, §§ 9507, 9504, subd. (3)) and good faith (*id.*, § 1203).

---

[6]Professor Gilmore reached the same conclusion with respect to the right to redeem the collateral under Uniform Commercial Code section 9-506. (2 Gilmore, *supra*, § 44.2, pp. 1217-1218.) Likewise, he concluded that lienholders should participate in the distribution of proceeds after liquidation under Uniform Commercial Code section 9-504 which, unlike our section 9504, makes no reference to liens. Referring back to sections 9-505(2) and 9-506, he wrote: "Those sections, like § 9-504(1)(c), refer expressly only to Article 9 'secured parties' or 'security interests.' In all three cases, however, the reference should be read broadly to include the liens." (2 Gilmore, *supra*, § 44.8, p. 1250.)

We conclude that strict foreclosure cannot operate to extinguish the rights of an execution lienholder without notice to the lienholder where, as here, the would-be foreclosing creditor has received written notice of the execution lien.[7]

## II. *Sufficiency of "Notice"*

██ Bank asserts that it gave notice of the proposed foreclosure in July 1989, when its attorney sent Oliver's attorney copies of pleadings from Bledsoe's action against Bank. We find only one of these enclosures in the present record, i.e., Bledsoe's first amended complaint. We fail to see how this document could be deemed to constitute notice to Oliver of an impending foreclosure. The complaint deals only with Bank's purported notice to Bledsoe in December 1988, an event then seven months past. In fact, the reader of the complaint would be led to believe the attempted foreclosure had failed, in that Bledsoe alleged he had served a timely objection; had this been true, Bank's notice of foreclosure would have been a legal nullity. (See § 9505(2).)

Nor would anything in the cover letter from counsel for Bank have told Oliver that Bank sought to extinguish his lien. The letter indicated that the Chang note might be returned ("retransfer[red]") to Bledsoe; the letter gave no notice to Oliver of a proposed retention of collateral under section 9505(2). The only challenge to Oliver's lien concerned the specificity of the notice of levy, consistent with Bank's earlier memoranda of garnishee (see fn. 2, *ante*).

Even, however, assuming the July 14 letter was a notice of foreclosure, Oliver's response of July 25 was a sufficient written objection to prevent any then-pending foreclosure under section 9505(2) as against his rights. Certainly the response was timely, coming well within the 21-day statutory period. We also believe the letter was adequate to communicate Oliver's opposition to any disposition that did not take full account of his lien.[8]

Bank asserts the letter was deficient for lacking a "demand that a foreclosure sale under § 9504 be conducted." Section 9505(2) does not require such

---

[7]In light of our holding, we need not address whether, irrespective of notice, strict foreclosure can *ever* extinguish an execution lien. We merely note that under the Enforcement of Judgments Law (Code Civ. Proc., § 680.010 et seq.), as discussed later in this opinion, a retention of collateral under section 9505(2) is not among the enumerated transfers that free encumbered property of the lien. (Code Civ. Proc., § 697.740; see fn. 11, *post*.)

[8]"[T]his letter will serve as formal notice to you that Mr. Oliver *claims an interest* in the Chang Note. He does not agree to the proposed 'retransfer' of the note to Mr. Bledsoe *or to any other entity unless and until Mr. Bledsoe's interest in the note*, upon which Mr. Oliver levied in July of last year, *is relinquished to Mr. Oliver*, or some suitable mechanism for marketing the Chang Note is mutually agreed to by Mr. Oliver, Mr. Bledsoe and the bank.

"To the extent the bank claims to have taken the Chang Note pursuant to Section 9504 of the California Commercial Code, this letter will constitute a formal written *demand by Mr.*

a demand or any other form of words; it requires only an "objection in writing" to the proposed retention of collateral. Understandably, Oliver's attorney failed to refer to any proposed retention of collateral, since he had never been informed that Bank intended to assert any such retention as against Oliver. A secured party's power under section 9505(2) to strictly foreclose is subject to the right of the third parties, as specified, to veto it. That right, on the face of the statute, appears absolute. (See 2 Gilmore, Security Interests in Personal Property, *supra*, § 44.3, p. 1226.) Assuming, therefore, that Oliver received notice of Bank's intention to retain the note under section 9505(2) and was required to object, he sufficiently did so.

We conclude that Bank's retention of the note under section 9505(2) did not extinguish Oliver's lien.

### III.   *Survival of Lien Under Enforcement of Judgments Law*

Having determined Oliver's lien was not extinguished under section 9505(2), we consider whether it expired under the Enforcement of Judgments Law (Code Civ. Proc., § 680.010 et seq.).[9]  █   Bank contends the lien expired from lapse of the two-year limitation on execution liens provided in section 697.710.[10] The heart of this argument is that Oliver's second levy was ineffectual because, prior to that levy, pursuant to section 9505(2), Bank had acquired Bledsoe's interest in the Chang note, thus eliminating any "property of the judgment debtor" to which the lien could attach. (§ 695.010.) In effect, Bank argues the original lien was rendered nonrenewable by Bank's foreclosure of Bledsoe's interest, and expired in July 1990, two years after issuance of the underlying writ, with the result no valid execution lien existed at the time of the trial court's order.

Bank's argument rests on its reading of section 695.010, subdivision (a), which states: "Except as otherwise provided by law, all property of the judgment debtor is subject to enforcement of a money judgment." Bank interprets the statute to mean that even though an original execution lien has

---

*Oliver for his share of any and all proceeds of the sale* of the Chang Note *pursuant to Section 9504(c)* of the California Commercial Code. In this regard, *Mr. Oliver will look to the bank for indemnity if the Chang Note is transferred without Mr. Oliver's receiving his share of the proceeds.*" (Italics added.)

[9]All further statutory references are to the Code of Civil Procedure unless otherwise indicated; as above, section 9505(2) refers to California Uniform Commercial Code section 9505, subdivision (2).

[10]"A levy on property under a writ of execution creates an execution lien on the property from the time of levy until the expiration of two years after the date of issuance of the writ unless the judgment is sooner satisfied." (§ 697.710.)

An execution lien may also be terminated by means not pertinent to this case, e.g., a stay of enforcement of the judgment. (§ 697.040.)

been validly created in property of the debtor, a subsequent levy cannot attach to the same property if the debtor has meanwhile been divested of interest in the property. This is not what the statute says, nor what it means.

The purpose of section 695.010, subdivision (a) is to define expansively the *types* of property subject to execution. (See Cal. Law Revision Com. com. to 1982 Addition, 17 West's Ann. Code Civ. Proc. (1987 ed.) § 695.010, p. 138 [Deering's Ann. Code Civ. Proc. (1983 ed.) 695.010, p. 230] [gist of statute is that "*all* property of the judgment debtor, regardless of type or interest, is subject to enforcement . . . unless an exception is provided by law" (italics added)].) The statute was not intended nor does it purport to address the question of the survival, extinction, or renewal of a lien once validly attached. In particular, it does not address the effect of a subsequent transfer of the liened property. That question is explicitly addressed by section 697.740, which provides that if a given transfer is not among the enumerated exceptions, the property levied on remains subject to enforcement of the lien after the transfer.[11] The section does not mention a retention under section 9505(2), nor does Bank suggest that any of the specified exceptions apply. Oliver's lien therefore comes within the rule of section 695.070, which provides that "if the property remains subject to the lien after the transfer . . . , the money judgment may be enforced against the property *in the same manner and to the same extent as if it had not been transferred or encumbered.*" (Italics added.)

In sum, unless a transfer of the liened property comes within one of the enumerated exceptions, the lienholder's rights against the property remain as they were before the transfer. One of these rights is to levy successively upon the property. (See § 699.510, subd. (a) ["Writs may be issued successively until the money judgment is satisfied"]; § 697.020, subd. (b) [creditor can create "a later lien of the same . . . type . . . on the same property under the same judgment"]; compare former § 688, subd. (e), added by Stats. 1977, ch. 155, § 1, p. 619 and repealed by Stats. 1982, ch. 1364, § 1, p. 5070, eff. July 1, 1983 ["No levy shall bind any property for a longer period than one year . . . . However, an alias execution may be issued on said judgment and levied on any property not exempt from execution"]; see 33 C.J.S., Executions, § 131, p. 304 ["At common law, and unless otherwise provided by statute, the lien may be continued, or, rather, an uninterrupted succession of liens may be kept up, by delivering a new execution into the

---

[11]"Except as provided in Section 9504 of the Commercial Code and in Section 701.630, if personal property subject to an execution lien is not in the custody of a levying officer and the property is transferred or encumbered, the property remains subject to the lien after the transfer or encumbrance except where the transfer or encumbrance is made to one of the following persons . . . ." (§ 697.740.)

hands of the sheriff at the same time that the former writ is returned." (Fn. omitted.)].) As long as each successive levy takes place before the existing lien has expired, the lien thus created relates back to the time of creation of the first such lien. (§ 697.020, subd. (b).) More importantly, by the terms of section 697.710, each such levy "creates an execution lien on the property from the time of levy until the expiration of two years after the date of issuance of the writ unless the judgment is sooner satisfied." In effect, then, the creditor can renew or extend the lien until the judgment itself is satisfied (or becomes stale). (See § 683.020.)

Since successive levy is one of the creditor's rights of enforcement against property that has not been transferred, the right survives a transfer that is subject to section 697.740's general rule of survival of execution liens. As we have determined, Bank's retention (or strict foreclosure) of the note was a transfer subject to the general rule of section 697.740. Consequently, Oliver's ability to protect and enforce his execution lien, including his right to renew the lien by a timely subsequent levy, was unimpaired by the transfer. His second levy was therefore effective to extend the life of his lien.

## IV. *Sanctions*

Asserting that Bank's appeal is frivolous, Oliver asks that we impose sanctions in the nature of his attorney fees and costs. We decline to do so. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179].)

## DISPOSITION

The judgment is affirmed.

White, P. J., and Chin, J., concurred.